Thomas O. Chimeba, J.
It is well settled that a broker’s commission, payable by the seller (lessor), is earned when he produces a customer (lessee) ready, willing and able to comply with all the terms fixed by the seller (lessor). The meeting of the minds of the seller (lessor) and purchaser (lessee) must be complete, not only as to price, but on all the terms of the contract (lease). And he must be the procuring cause of the sale (lease). (Colwell v. Tompkins, 6 App. Div. 93; Meyer v. Le Mieux, 110 N. Y. S. 2d 689; Laubocker v. Niagara County Sav. Bank, 67 N. Y. S. 2d 819.)
It is equally well settled that the parties may vary the rule by expressly agreeing that the payment of commission shall be *378 conditioned upon the happening of a specified act or eventuality. (Amies v. Wesnofske, 255 N. Y. 156, and cases therein cited.)
. And as a corollary, it is the law that “ If a promisor himself is the cause of the failure of performance of a condition upon which his liability depends, he cannot take advantage of the failure.” (Amies v. Wesnofske, supra, p. 162; Williston, Contracts [rev. ed.], vol. 3, § 677, p. 1952.)
Plaintiff invokes these postulates as the law for the facts of his case which was tried before this court without a jury, mainly on an agreed state of facts.
At the outset of trial, the action was dismissed as against the second-named defendant, Adolph D. Storch, with prejudice, without costs and on consent of the parties.
Findings of fact and conclusions of law were waived.
Plaintiff, a licensed real estate broker, sues defendant Five Eleven Bealty Corporation for brokerage commissions, claiming to have earned said sum by reason of having brought defendant and one Scully-Walton, Inc., together on a lease to the first floor of premises 511 East 72nd Street, New York City, N. Y.
11 Scully ’ ’ was to occupy the space leased for ‘1 office, storage and distribution of medical supplies — oxygen—hospital apparatus, and the storage of twenty (20) vehicles (ambulances, station wagons and trucks), including repair of same.”
The building in which the léased space is located runs through from East 72nd Street to East 73rd Street. At the time negotiations were being entered into by defendant and “ Scully”, East 72nd Street was zoned in a residential • use district and East 73rd Street in an unrestricted usé district.
The “ Broker’s letter” incorporated by reference in said lease provides among other things that plaintiff “ is to receive in full satisfaction for his services with respect to the said lease '* * * the sum of $3381.25, which sum shall be due and payable when and only if Scully-Walton, Inc. obtains the necessary permits, certificate of occupancy, etc., necessary to possession under the terms of the lease.” (Emphasis ours.)
“ Scully”, with defendant’s written consent in accordance with the terms of the lease, thereafter made an application for a permit to alter the space under consideration, for use as a garage for the storage of ambulances, oxygen and as a showroom on the 72nd Street side and as a storage area and factory on the 73rd Street side; that this application was denied by the Borough Superintendent on the ground that such use would constitute a change from a nonconforming use into another nonconforming use, contrary to the applicable zoning resolution; that ‘£ Scully ’ ’ applied for and obtained from the Board of *379 Standards and Appeals of the City of New York the necessary variation, and thereafter ascertained that no new certificate of occupancy would be issued by the. Department of Buildings unless the upper floors in the building in which the leased premises 'are located were made to qualify,. necessitating an estimated expenditure upwards of $30,000.
Defendant refused to assume the cost of maldng the alterations to the upper floors, claiming that those expenditures were among “ Scully’s ” obligations under the lease. “ Scully ”, on the other hand, took the contrary position, as a result of which no alterations to any part of the building were made and no certificate of occupancy was applied for. Defendant thereafter elected to cancel the lease pursuant to paragraph 44, and “ Scully ” accepted the cancellation.
Plaintiff contends that it was defendant’s duty to make the alterations to the upper floors and that only defendant could apply for a certificate of occupancy, arguing that defendant itself was the cause of the failure of performance of the condition upon which its liability to plaintiff depended, and, therefore, may not take advantage of its own failure.
Whether this argument is valid depends on a careful analysis of the lease itself, the critical provisions of which follow: “tenant is given permission to and agrees to make certain alterations in the premises as hereinafter set forth, * * *.
“ Landlord agrees that as to the total cost for such alterations advanced by tenant, tenant shall receive a credit against its monthly rent prorated over the first 2 years in equal monthly deductions. The aforementioned alterations shall include the following: [Here follows a list of alterations all within the space demised in the lease.]
“ Landlord agrees to place all necessary contracts and supervise same for tenant so as to carry out the above-mentioned alterations and repairs. Up to the first Six Thousand Dollars ($6000.00) of cost, tenant will pay bills immediately upon approval by landlord, provided the work covered by said bills is completed. If however, tenant can provide a contractor who offers to do the work proposed at a lower price, landlord shall allow tenant’s contractor to do said work, provided said contractor is capable of doing the alterations proposed and is properly licensed.”
The underlying agreement .between defendant and ScullyWalton, Inc., was that the latter was to rent space from the former for a stipulated rental and assume the responsibility of legalising the specified alterations which “Scully” undertook to make. Bead in this context, paragraph 44 of the lease *380 providing that Scully-Walton, Inc., was to procure and submit to the proper city authorities plans and specifications for the uses enumerated in the lease of the premises, and to “ obtain thereafter the necessary certificate of occupancy ”, the defendant (landlord) agreeing “ to cooperate with the tenant to effect the foregoing ’ ’, leads to one conclusion only, namely, that the tenant was to bear the burden and cost while the landlord was to facilitate access to governmental consent by all necessary means including permission to alter the landlord’s property within the area of the space leased. Defendant did not expect and “ Scully ” did not undertake, to become responsible for or to assume the expense of altering any portion of the building outside of the space sought to be leased!
But if it be a fact that “ Scully ” never undertook to alter at its expense any portion of defendant’s building other than the space sought to be leased, it is also a fact that defendant never undertook to make substantial alterations to the upper floors of its building solely to accommodate “ Scully ” and “ Scully ” never expected that defendant would I
Four clues buttress these conclusions :
1. The alterations contemplated by ‘ ‘ Scully ’ ’ and defendant were limited to the space sought to be demised and were specified in conspicuous detail in the lease.
2. “ Scully” and defendant carefully provided in the lease, the manner in which the cost of the specified alterations ivas to be defrayed and by whom, establishing an expected cost ceiling in the neighborhood of $6,000, a figure more nearly applicable to the specified alterations than to hindsight “ obligations ” wholly unanticipated by either party.
3. Ño estimates for the alterations required in the upper floors of defendant’s building were obtained or even sought, until it became evident that procuring a variance from the applicable zoning regulation and an approval of the plans and specifications for the alterations specified in the lease would be insufficient to accomplish the issuance of a new certificate of occupancy, and finally,
4. Both “ Scully ” and defendant decided to cancel what promised to be a substantial lease and mutually profitable agree-men only after repeated extensions of time and after heroic attempts to save the situation.
The American Law Institute, enlarging on the doctrine of Amies v. Wesnofske {supra) furnishes us with a “ guidepost ” to a clear understanding of the problem here.
Under the caption excuse of condition by pbbvention ob hindrance, section 295 of its Restatement of the. Law of Con *381 tracts says: ‘ ‘ If a promisor prevents or hinders the occurrence of a condition, or the performance of a return promise, and the condition would have occurred or the performance of the return promise been rendered except for such prevention or hindrance, the condition is excused, and the actual or threatened non-performance of the return promise does not discharge the promisor’s duty”. (Emphasis ours.)
Having concluded, as this court does, that neither “ Scully ” nor defendant was obligated under the lease to make alterations to the upper floor of defendant’s building, defendant’s refusal to assume such an obligation cannot be construed as a prevention or hindrance excusing the condition.
Moreover, this is not a situation where the condition would have occurred or the performance of the return promise been rendered except for such prevention or hindrance.
Knowing as we do that ‘ ‘ Scully ’ ’ decided not to proceed further with the lease in view of defendant’s refusal to assume the responsibility and expense of altering the upper floors, it makes no difference which elected to terminate the lease, defendant or “ Scully”. For all practical purposes, the lease was “dead”. Indeed, the lease never had an enforcible life. There never was a complete meeting of the minds from the very beginning!
Defendant is entitled to judgment dismissing the complaint on the law and on the facts. Thirty days’ stay. Sixty days to make a case. In view of the foregoing, all other issues raised in this case are ruled academic. The Clerk is directed to return the exhibits to counsel entitled thereto.